UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LIFE TECHNOLOGIES CORP. and APPLIED
BIOSYSTEMS LLC,

                              Plaintiffs,

      -vs-

AB SCIEX PTE. LTD. and DH
TECHNOLOGIES DEVELOPMENT PTE.
LTD.,

                              Defendants.

11 Civ. 325 (RJH)

**MEMORANDUM OPINION
AND ORDER**

---

Richard J. Holwell, District Judge:

      Plaintiffs Life Technologies Corporation ("Life Tech") and Applied Biosystems LLC ("AB LLC"), a wholly-owned Life Tech subsidiary, brought this action alleging trademark infringement and breach of contract by defendants AB Sciex Pte. Ltd. ("ABSPL") and DH Technologies Development Pte Ltd. ("DHTD") on January 18, 2011.  Now before the Court is plaintiffs' motion for a preliminary injunction restraining the defendants from using the trademark "AB SCIEX" in connection with products that plaintiffs contend are not covered by a licensing agreement.  For the following reasons, the motion is DENIED.

<div align="center">BACKGROUND</div>

**I.  Life Tech and the Mass Spectrometry Business**

      Life Tech, a biotechnology company formed in November 2008, is the result of Invitrogen Corporation's acquisition of Applied Biosystems Inc. ("AB Inc.").  (Singer Decl. ¶ 3; Szekeres Decl ¶ 3.)  AB Inc. had been involved in the business of delivering products and services for basic science research, commercial research, and standardized testing for over

twenty-five years prior to November 2008, and identified its products using the trademark "AB Applied Biosystems" beginning in 1982.  (Singer Decl. ¶ 4.)  Life Tech continued to use AB Inc.'s trademark after November 2008.  (*Id.* ¶ 7.)

Part of AB Inc.'s business was a joint venture (the "Joint Venture") in which it had a 50% stake and which it operated with MDS Analytical Technologies Inc. ("MDS").  (*Id.* ¶ 11; Trivedi Decl. ¶ 2.)  The Joint Venture was in the business of designing, manufacturing, and selling mass spectrometry instruments, reagents (referred to as "consumables"), and software for use in mass spectrometry.  (Singer Decl. ¶ 12.)  Mass spectrometry is a technique used to determine the chemical compounds, and sometimes their absolute or relative abundance, in samples.  (*Id.*; Ellis Decl. ¶ 3.)  For example, mass spectrometry can be used "to identify a range of anabolic steroids in a urine sample."  (Ellis Decl. ¶ 3.)  Mass spectrometry is one among a variety of methods for identifying molecules, and any of those methods require three things: "method-specific instruments; method specific consumables; and method-specific software."  (Singer Decl. ¶¶ 22, 23.)  Together, those three things constitute an "integrated solution" or a "platform."  (*Id.* ¶ 23.)

The Joint Venture sold a mass spectrometry platform using the word mark "AB SCIEX" and an associated logo mark (together, the "AB SCIEX Marks").  (Singer Decl. ¶¶ 14, 16; *see* Bond Decl. ¶¶ 2-3.)  The use of the AB SCIEX Marks to market and sell mass spectrometry instruments, services, software, and reagents continued after Life Tech succeeded AB Inc. (Singer Decl. ¶ 18.)  The platform included mass spectrometry instruments, accessories, reagents, and software products for analysis.  (Singer Decl. ¶ 16.)  Elements of the platform "were designed to work well together" and customers valued their nature "as a single, integrated solution."  (*Id.* ¶ 13.)

2

## II. Sale of the Joint Venture and Agreements in Connection with the Sale

In 2009, Life Tech and MDS decided to sell their interests in the Joint Venture to Danaher Corporation ("Danaher"). (Singer Decl. ¶ 26; *see* Trivedi Decl. ¶ 2.) On September 2, 2009, Life Tech, Danaher, and a Danaher affiliate named DH Technologies Development Pte. Ltd. ("DHTD") signed a Stock and Asset Purchase Agreement ("Purchase Agreement"). (Szekeres Decl. ¶ 5.) The Purchase Agreement laid out the terms of sale of the Joint Venture's mass spectrometry business to Danaher and DHTD, including provisions that, among other things: select New York law as the governing law of the Purchase Agreement; specify a dispute-resolution procedure that includes arbitration; except pre-arbitral injunctions from the dispute-resolution procedure; and evince an agreement to accept both the jurisdiction of and venue in this Court. (Szekeres Decl. Ex. A §§ 11.4, 11.5, 11.6.) Danaher ultimately held the mass spectrometry business in ABSPL, one of its affiliates. (Bond Decl. ¶ 4.)

The Purchase Agreement also contemplated the execution of other agreements prior to the closing of the transaction. (*See* Romero Decl. Ex. A §§ 1.1, 4.2.) Among these agreements was a Trademark Assignment Agreement, in which the Joint Venture would assign the rights to the AB SCIEX Marks to Life Tech. (*See id.* § 4.2.) AB LLC, a wholly-owned Life Tech subsidiary, ultimately became the owner of the AB SCIEX Marks. (Singer Decl. ¶ 15.) More importantly, the Purchase Agreement contemplated the execution of a Trademark License Agreement ("License Agreement"), which Life Tech, AB LLC, and ABSPL executed on January 29, 2010, delineating the terms of ABSPL's right to use the AB SCIEX Marks. (Szekeres Decl. Ex. B ("License Agreement").)

The License Agreement granted ABSPL "an exclusive (even as to [Life Tech and AB LLC]), perpetual, worldwide, royalty-free and fully paid-up license to use the AB SCIEX

3

MARKS and the AB SCIEX LOGO MARK solely in connection with Mass Spec Operations, subject to the limitations set forth in this Agreement." (License Agreement § 2.2.) "Mass Spec Operations" is defined in the License Agreement as "developing, designing, selling, re-selling, leasing, providing access to, manufacturing, offering, providing, distributing or marketing Mass Spectrometry Instruments or Mass Spectrometry Services." (*Id.* § 1.3.) The capitalized terms therein are also defined in the License Agreement. "Mass Spectrometry Instruments" are:

> instruments for determining the elemental or chemical composition of a sample, or the absolute or relative abundance of a sample, using a method comprising (a) applying a sample to the instrument, (b) ionizing the sample or its components, (c) directing the resulting ions into an electromagnetic field, (d) computing the mass to charge ratio of the resulting ions based on their motion or frequency or kinetic energy or momentum as they travel through the field, and (e) detecting the ions. The term "Mass Spectrometry Instruments" includes parts used to repair such instruments described above. For avoidance of doubt, and without limitation, electrophoresis instruments (including, without limitation, capillary electrophoresis instruments) are not within the definition of "Mass Spectrometry Instruments."

(*Id.* § 1.4.) "Mass Spectrometry Services" means "installing, calibrating, repairing, maintaining, training, supporting, updating, remote monitoring, and otherwise servicing Mass Spectrometry Instruments." (*Id.* § 1.5.) The License Agreement further provided that ABSPL "shall not, and [ABSPL] is not authorized to, use the LICENSED TRADEMARKS [including the AB SCIEX Marks] in connection with any business or products other than Mass Spec Operations . . . ." (*Id.* § 3.5.) In addition, the License Agreement stated:

> For the avoidance of doubt, [ABSPL] and its Affiliates may use the AB SCIEX MARKS and the AB SCIEX LOGO MARK as part of their corporate names or in corporate branding, including without limitation in dba's and other corporate designations, for the term of this Agreement, subject to the terms and conditions set forth in this Agreement.

(*Id.* § 2.8.)

As part of the Purchase Agreement, plaintiffs agreed not to compete with ABSPL in the Mass Spec Operations area for a period of four years.  (Romero Decl. Ex. A § 7.23(a).)  Plaintiffs also agreed as part of the License Agreement not to use the AB SCIEX Marks from and after the date of the License Agreement.  (License Agreement § 2.7.)   DHTD also agreed in the Purchase Agreement to cause its affiliates to fulfill their obligations under the Purchase Agreement and any agreements ancillary to the Purchase Agreement, including the License Agreement.  (*See* Szekeres Decl. Ex. A § 11.16.)

The sale of the Joint Venture's mass spectrometry business closed on January 29, 2010, and the parties delivered a fully executed License Agreement on that date.  (Szekeres Decl. ¶ 7.)

### III. Post-Sale Conduct

After executing the License Agreement, in February 2010, Danaher's inside counsel called Life Tech's inside counsel to ask whether Life Tech would expand the trademark license to cover reagents; Life Tech's counsel replied that it would not.  (Szekeres Decl. ¶ 11.)  In March 2010, Vicki Singer, Global Head of Out Licensing for Life Tech, noticed that ABSPL was using the AB SCIEX Marks in connection with reagents and software.  (Singer Decl. ¶ 35.)  In particular, the AB SCIEX Marks appeared on many of the web pages (at www.absciex.com) featuring ABSPL's reagents and software.  (*Id.* ¶¶ 36, 37.)

On April 14, 2010, Singer e-mailed a Danaher representative to inform him that Life Tech believed that Danaher was in violation of the License Agreement because it was marketing consumables on the absciex.com website and because those consumables bore the AB SCIEX Marks.  (Singer Decl. Ex. A.)  On April 21, 2010, Singer and other Life Tech representatives participated in a conference call with representatives from ABSPL and Danaher.  (Singer Reply Decl. ¶ 7.)  The Life Tech representatives gave ABSPL and Danaher "two options for complying

with the Trademark License Agreement": using a different corporate brand for all products or using one brand for instruments and one for consumables and software.  (*Id.*)  On April 22, 2010, ABSPL agreed to remove the AB SCIEX Marks from all webpages relating to consumables, to launch a new sciex.com website to host all consumables product webpages, and to place language on the absciex.com website to direct potential reagents consumers to the sciex.com website.  (*Id.* ¶ 8.)  ABSPL estimated that it would take three weeks to migrate the consumables and reagents webpages to the sciex.com website.  (*Id.* ¶ 9.)  On April 28, 2010, Singer followed up on the previous communications and pointed out also that it was Life Tech's position that using the AB SCIEX Marks on "application software" was an infringing use of the marks, a position ABSPL disputed on May 4, 2010.  (*Id.* ¶¶ 10, 12.)  The parties continued discussions attempting resolution of the matter (though less frequently after June 8, 2010) until October 14, 2010, but communications between the parties about this matter ceased after that point.  (*See id.* ¶¶ 22, 23.)

ABSPL did set up a sciex.com domain name and placed the webpage marketing reagents under the sciex.com URL.  (Singer Decl. ¶ 45.)  The sciex.com reagents webpage, however, is integrated with the absciex.com website.  The format, look, and feel of the reagents webpage is very similar to that used on absciex.com; the pages use the same navigation bar at the top of the page, and differ only in that the sciex.com website lacks the AB SCIEX logo mark in the upper left corner and reads "SCIEX" at the bottom of the page instead of "AB SCIEX."  (*Compare* Singer Decl. Ex. D *with id.* Ex. E.)  A potential customer can also easily navigate back and forth between the absciex.com and the sciex.com websites using the common navigation bar.  (Singer Decl. ¶ 48.)  The webpage marketing mass spectrometry software products bears the AB SCIEX

Marks and is on the absciex.com website.  (*Id.* ¶ 51-52.)  ABSPL also markets both mass spectrometry software and consumables on its "Products" website.  (*Id.* ¶ 54.)

Plaintiffs brought this suit on January 18, 2011, asserting claims for breach of contract, trademark infringement, dilution, and unfair competition, and filed this motion for a preliminary injunction.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 empowers a district court to issue a preliminary injunction on notice to the adverse party.  *See* Fed. R. Civ. P. 65(a).  "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing,* carries the burden of persuasion."  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (emphasis in original).  "In order to justify a preliminary injunction, a movant must demonstrate 1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest weighs in favor of granting an injunction."  *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (quotation marks and internal citation omitted).

## DISCUSSION

Plaintiffs assert three grounds for the preliminary injunction they seek: trademark infringement under the Lanham Act, dilution under New York law, and breach of contract under New York law.  Defendants have argued that the License Agreement grants them the right to use the AB SCIEX Marks in the way they are currently used.

### I. Irreparable Harm

The Court begins by analyzing whether plaintiffs have shown irreparable harm. "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir. 1999)). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation marks omitted). Hence "a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotation marks omitted). Life Tech attempts to show irreparable harm in three ways: (1) a contractual acknowledgement in the License Agreement that monetary relief would be inadequate; (2) its being forced to compete with ABSPL's mass-spectrometry, AB SCIEX-branded platforms; and (3) the presumption of irreparable harm arising from trademark infringement and dilution. These arguments, however, fail to carry plaintiffs' burden on showing irreparable harm.

### A. Contractual Acknowledgment

In section 9.4 of the License Agreement, ABSPL "acknowledge[d] that monetary relief would not be an adequate remedy for a breach or threatened breach by the Licensee of the provisions of this Agreement and that [plaintiffs] shall be entitled to the enforcement of this Agreement by injunction, specific performance or other equitable relief . . . ." Such a provision

"might arguably be viewed as an admission by [defendants] that plaintiff will suffer irreparable harm were [defendants] to breach" the contract. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). On the other hand, "contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate." *Baker's Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987). Such language is instead "merely one factor that must be considered in deciding whether irreparable harm would result if an injunction did not issue," *Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001), and a plaintiff "cannot rely on the contract provision alone to demonstrate irreparable harm." *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 Civ. 1979 (PKL), 2007 WL 950092, at *6 (S.D.N.Y. Mar. 28, 2007). Plaintiffs in this action, therefore, cannot rely on section 9.4 of the License Agreement alone to prove irreparable harm for the purposes of this motion.[1] The Court therefore considers plaintiffs' remaining arguments on irreparable harm.

### B. Competition with ABSPL Platforms

Next, Life Tech argues that it "faces irreparable harm with regard to its molecular identification platforms." (Pl.'s Mem. at 21.) This is because "ABSPL's impermissible use of the AB SCIEX Marks to promote . . . its entire mass spectrometry platform . . . will likely lead customers to purchase from ABSPL a mass spectrometry platform rather than an AB Platform." (*Id.*) Life Tech further argues that it "may re-enter the mass spectrometry market in a few years at the expiration of the non-compete term" and that "[i]f ABSPL's violations are allowed to continue, Life Tech would upon reentry into the market be forced to compete against its own

---

[1] Plaintiffs' citations to *Ticor Title*, 173 F.3d at 69 and *Nat'l Elev. Cab & Door Corp. v. H&B, Inc.*, 282 F. App'x 885, 887 (2d Cir. 2008), do not show otherwise. In neither case did the Second Circuit hold that a contractual provision alone sufficed to show irreparable harm. Instead, in both cases, the court merely considered the contractual provision as one factor in the analysis, consistent with *Baker's Aid*.

9

mark with respect to reagents and software." (*Id.* at 20.)  Neither argument supports a finding of irreparable harm.

The argument that Life Tech will suffer irreparable harm by having to compete against its own mark in the mass spectrometry market is both remote and speculative.  It is remote because Life Tech does not argue that it currently competes with ABSPL's products in the mass spectrometry market; rather, it asserts only that it "may re-enter" that market at the expiration of the four-year non-compete term.  (Pl.'s Mem. at 20.)  It is also speculative in that Life Tech does not state even a current intention to reenter the market at the end of the four year term, but only a possibility that it may do so.  That argument, therefore, does not support a conclusion that irreparable harm would result absent the granting of a preliminary injunction.

Neither does the prospect of having to compete with ABSPL in the broader molecule-identification market constitute irreparable harm.  It is true that in some cases, competition from a former licensee who has agreed not to compete in the relevant market can raise the specter of irreparable harm.  *See, e.g.*, *ServiceMaster Residential/Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc.*, No. 01 Civ. 2229 (JSM), 2001 WL 396520, at *4 (S.D.N.Y. Apr. 19, 2001) ("[T]he potential harm to Plaintiff arises from Defendant's ability to trade on the knowledge and customer relationships gained as a ServiceMaster franchise, which impacts on Plaintiff's good will and its interest in re-franchising the market.").  Also, where a former licensee of a mark continues to use the mark even after his authorization expires, courts have found irreparable harm.  *See, e.g.*, *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42-44 (2d Cir. 1986) ("[A] licensor that establishes infringing use and consumer confusion in a trademark suit brought against its former licensee has proved irreparable harm as a matter of law.").  This case, however, is not either of those situations.  First, there is no

covenant not to compete. And second, it is not contended that defendants have no right to use the mark—indeed, the License Agreement affirmatively grants them the right to use the AB SCIEX Marks in connection with "Mass Spec Operations." As such, the harm claimed here is not that of a former licensee of a mark making completely unauthorized use of the mark as in *Church of Scientology*, but that related to ABSPL's incremental, allegedly unauthorized use of the mark on mass spectrometry software and reagents. That is, ABSPL is allegedly exceeding their authorized use of the mark rather than making completely unauthorized use of it.

Thus, Life Tech cannot claim the general harm of having to compete with AB SCIEX-branded mass spectrometry products as the irreparable harm flowing from ABSPL's alleged breach of contract, but must be claiming the incremental harm from ABSPL's increased ability to compete because of its branding of reagents and software with the AB SCIEX Marks instead of a simpler "SCIEX" mark. Essentially, the purported harm here is one of lost profits stemming from ABSPL's increased ability to compete. Life Tech, however, offers only conclusory statements as to why this harm would be irreparable. It asserts only that it "faces irreparable harm with regard to its molecular identification platform" because ABSPL's ability to market an integrated mass spectrometry platform "will likely lead customers to purchase from ABSPL a mass spectrometry platform rather than a[] . . . platform" from plaintiffs. (Pl.'s Mem. at 21.) This states a harm and concludes that it is irreparable, but makes no argument as to why it is irreparable. Life Tech, therefore, has not made a sufficient showing of irreparable harm based on competition with ABSPL's mass-spectrometry platforms.[2]

---

[2] To the extent plaintiffs in this argument intended to rely on the irreparable harm associated with loss of goodwill, trademark infringement, and trademark dilution, the Court finds below that plaintiffs' delay in seeking the injunction belies that contention.

## C. Goodwill, Trademark Infringement, and Dilution

Third, Life Tech next contends that harm to its goodwill and reputation constitute irreparable harm. Plaintiffs argue that ABSPL's use of the AB SCIEX Mark damages their goodwill because they "cannot control the quality of ABSPL's products or the impact that any sub-standard goods will have on plaintiffs' reputations with consumers." (Pl.'s Mem. at 20.) Plaintiffs also argue that they are entitled to a presumption of irreparable harm flowing from a finding of likely dilution. (*Id.*) In general, "a loss of prospective goodwill can constitute irreparable harm," *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995), though "not where the loss of goodwill was doubtful and lost profits could be compensated with money damages." *John E. Andrus Mem'l, Inc. v. Daines*, 600 F. Supp. 2d 563, 571 (S.D.N.Y. 2009).

But plaintiffs' delay in seeking the injunction in this case counsels against a finding of irreparable harm. Plaintiffs discovered ABSPL's alleged violations of the License Agreement in March 2010. (Singer Reply Decl. ¶ 3.) This motion was filed on January 18, 2011, over nine months later. During that time, the parties made some attempts to settle this dispute without the need for litigation, with fairly regular communication between April 14, 2010, and June 8, 2010. (Singer Reply Decl. ¶¶ 7-18.) After that point, the record shows only three communications between the parties, one on July 15, 2010, one on September 16, 2010, and one on October 14, 2010. (*Id.* ¶¶ 19, 21-22.) The delay from that point until January 18, 2011, is explained only in general terms; during that time, "Life Tech continued its investigation and conducted internal meetings to formulate a response to ABSPL." (*Id.* ¶ 23.)

"[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d

12

417, 419 (S.D.N.Y. 1998). This is because a "failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979)). In *Citibank*, for example, the Second Circuit found that the plaintiff failed to demonstrate irreparable harm where it did not seek an injunction until "more than ten weeks after it learned directly" of the alleged infringer's plans and "more than nine months after it received notice through the press" of those plans. 756 F.2d at 276. Thus the Second Circuit later remarked that it has "found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction." *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (citing *Citibank*, 756 F.2d at 276-77). Here, over nine months passed between plaintiffs' discovery of the alleged violation of the license agreement and the filing of this preliminary injunction motion. And "[e]ven giving the plaintiffs credit for attempting to reach a settlement without litigation, we are still left with a three month delay since the plaintiffs' last communication with the defendant[s]." *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989). Such delay "somewhat vitiates the notion of irreparable harm." *Id.*; *see also Richard A. Leslie Co. v. Birdie, LLC*, No. 07 Civ. 5933 (LAK), 2007 WL 4245847, at *2 (S.D.N.Y. Nov. 26, 2007) ("The period from April 10 through June 8 may be excused . . . on the basis that the parties appear to have been engaged in discussions with a view to resolving the matter. The three month period from June 8 through September 18 cannot. It is sufficiently long, in and of itself, to warrant denial of preliminary relief . . . ."); *Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc.*, No. 00 Civ. 5746 (RO), 2001 WL 1097865, at *1 (S.D.N.Y. Sept. 19, 2001) ("That alone is a delay of twelve weeks, and such

13


delay 'tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.'" (quoting *Citibank*, 756 F.2d at 276)); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 281-82 (S.D.N.Y. 1998) ("But here there is no excuse whatever for the delay from mid-March until mid-June.  This delay is more than sufficient basis for concluding that any presumption of irreparable injury has been vitiated."); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F. Supp. 896, 910 (S.D.N.Y. 1995) ("Because plaintiff was fully aware of the jeans for nearly four months and of the shirts for approximately three months before seeking this preliminary injunction, the delay is not explained by the need for further investigation.  Despite the finding that defendants' pants and shirts are likely to cause confusion, plaintiff's lack of diligence militates against enjoining defendants from selling those items pending a prompt trial.").

The cases cited by plaintiffs do not establish otherwise.  In *Lexington Mgmt. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 277 & n.3 (S.D.N.Y. 1998), for example, the court found that the "delay was reasonable" because plaintiffs "brought this motion one week after settlement efforts broke down in January, 1998."  Likewise, in *Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517, 521 (S.D.N.Y. 1989), the period of delay was "consumed by constructive, responsible and accommodating efforts by plaintiff's legal counsel to resolve the matter without litigation."  The four months of delay in *Tom Doherty Associates*, 60 F.3d at 39-40, were found to be excused because "no inference" could have been drawn during that time that the plaintiff "actually believed" that the defendant "had no right to prevent licensing of the Power Rangers."  In *Schick Mfg., Inc. v. Gillette Co.*, 372 F. Supp. 2d 273, 282-84 (D. Conn. 2005), plaintiff's delay was explained first by plaintiff's desire to "subject the claims made in the contested

14

advertising to scientific testing" and second by plaintiff's pursuing litigation abroad before pursuing it domestically. None of these cases, in short, suggest that a delay of over three months that goes unexplained or is explained in conclusory terms such as "continued its investigation" or "formulat[ing] a response," (Singer Reply Decl. ¶ 23), would not rebut the presumption of irreparable harm that normally accompanies trademark infringement and dilution suits.

Here, then, the presumption of irreparable harm associated with the alleged breach of the License Agreement and trademark infringement has been rebutted by the three-month unexplained delay. Accordingly, plaintiffs have not adequately demonstrated irreparable harm, constituting sufficient grounds for denying the motion for a preliminary injunction.[3] *See Ayco Co. v. Feldman*, No. 1:10-CV-1213 (GLS/DRH), 2010 WL 4286154, at *5 (N.D.N.Y. Oct. 22, 2010) ("A movant's failure to establish irreparable harm is alone sufficient for a court to deny injunctive relief."); *Birdie, LLC*, 2007 WL 4245847, at *3 ("The Court finds that plaintiff has not sustained its burden of demonstrating a threat that it will be injured irreparably in the absence of provisional relief. Accordingly, its motion for a preliminary injunction is denied."); *Nitke v. Ashcroft*, 253 F. Supp. 2d 587, 610 (S.D.N.Y. 2003) ("Because we find that plaintiffs have not established that they will suffer irreparable harm in the absence of a preliminary injunction, it is unnecessary to reach the question of plaintiffs' likelihood of success on the merits.").

---

[3] After this motion was fully briefed, plaintiffs filed the Declaration of Mahbod Hajivandi detailing certain "eSeminars" at which ABSPL was promoting its products. Nothing in that declaration, however, changes the Court's analysis with respect to irreparable harm. Thus defendants' consent motion seeking leave to file a response to the Hajivandi Declaration is moot.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion **[3]** for a preliminary injunction is DENIED.

Defendants' consent motion **[40]** is DENIED as moot.

SO ORDERED.

Dated: New York, New York
        April **11**, 2011

_____
Richard J. Holwell
United States District Judge