UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LIFE TECHNOLOGIES CORP. and APPLIED
BIOSYSTEMS LLC,

                      Plaintiffs,

       -vs-

AB SCIEX PTE. LTD. and DH
TECHNOLOGIES DEVELOPMENT PTE.
LTD.,

                      Defendants.

11 Civ. 00325 (RJH)

**MEMORANDUM OPINION
AND ORDER**

---

Richard J. Holwell, District Judge:

      Defendant AB Sciex Pte. Ltd. ("AB Sciex") is a trademark licensee seeking to avoid arbitration with its trademark licensors, plaintiffs Life Technologies Corp. ("Life Tech") and Applied Biosystems LLC ("Biosystems"). Life Tech and Biosystems initiated arbitration pursuant to an arbitration clause in an asset purchase agreement (the "Purchase Agreement") by which AB Sciex's affiliate, defendant DH Technologies Development Pte. Ltd. ("DH Tech") purchased Life Tech's mass spectrometry business. That agreement also required the parties to execute, or cause their affiliates to execute, a trademark license agreement. Ultimately, Life Tech and Biosystems licensed the trademarks to AB Sciex through a license agreement (the "License Agreement") that does not contain an arbitration clause. Life Tech and Biosystems have since commenced arbitration proceedings against AB Sciex and DH Tech arising out of AB Sciex's use of the trademarks. AB Sciex now moves to enjoin those proceedings as to it, arguing that it is not a signatory to any agreement containing an arbitration clause and that its use of the trademarks is governed exclusively by the License Agreement. AB Sciex is estopped from

avoiding arbitration, however, because it knowingly exploited the direct benefits of the Purchase Agreement by obtaining and using the licenses provided by the License Agreement. Accordingly, AB Sciex's motion to enjoin the arbitration proceedings is DENIED.

## BACKGROUND

The facts in this case are set forth in detail in the Court's opinion denying plaintiffs' motion for a preliminary injunction, *Life Technologies Corp. v. AB Sciex Pte. Ltd.*, No. 11 Civ. 325, 2011 WL 1419612, at *1-4 (S.D.N.Y. Apr. 11, 2011), familiarity with which is assumed. The Court recounts the facts only as relevant to this motion.

In 2009 Life Tech transacted to sell its mass spectrometry business to Danaher Corporation ("Danaher"), an affiliate of defendant DH Tech. On September 2, 2009, Life Tech, Danaher, and DH Tech signed the Purchase Agreement laying out the terms of the sale. (*See generally* Szekeres Decl. Ex. A.) The Purchase Agreement, by which DH Tech bought Life Tech's mass spectrometry business for roughly $450 million, required that "[o]n or prior to the Closing (but subject to the Closing being consummated), (i) [DH Tech] shall, and shall cause its respective Affiliates[1] to, execute and deliver to [Life Tech] copies of the Ancillary Agreements to which such Person is a party . . . ." (*Id*. § 7.8; *see also id*. § 4.2(a)(v), (b)(iv) (requiring the parties to deliver the Ancillary Agreements at Closing); Szekeres Decl. ¶ 11.)

The Purchase Agreement also contained a detailed section on dispute resolution. As relevant to the present motion, the parties agreed therein that

> in the event of any dispute, controversy or claim arising out of, relating to or in connection with this Agreement or any other Transaction Document . . . or the

---

[1] Both the Purchase Agreement and the Trademark License Agreement define Affiliate as "with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person." (Purchase Agreement § 1.1 (defining "Affiliate"); *see* Szekeres Decl. Ex. B § 1.2.)

2

>breach, termination or validity thereof or the negotiation, execution or performance thereof (a "Dispute"), the parties shall attempt to settle such Dispute in the first instance by mutual discussions between representatives of senior management of each party.

(*Id*. § 11.6(a).)  Should a Dispute prove irresolvable through negotiation, then the dispute "shall be submitted to mediation in accordance with the JAMS International Mediation Rules." (*Id*. § 11.6(b).)  In turn, "[a]ny Dispute not timely resolved in accordance with Section 11.6(b) shall be finally and exclusively resolved by arbitration in accordance with the then-prevailing JAMS International Arbitration Rules and Procedures . . . ." (*Id*. § 11.6(c).)  The Transaction Documents referred to in Section 11.6(a) included the Purchase Agreement and all Ancillary Agreements. (*Id*. § 1.1 (defining "Transaction Documents").)

One of the Ancillary Agreements was the License Agreement. (*Id*. § 1.1 (defining "Ancillary Agreements").)  Life Tech and Biosystems executed that agreement with AB Sciex, a DH Tech affiliate, on January 29, 2010, the closing date of the Purchase Agreement. (*See generally* Szekeres Decl. Ex. B; Szekeres Decl. ¶ 10.)  The agreement's recitals noted the Purchase Agreement "whereby [DH Tech] has agreed to purchase, or cause affiliates to purchase, certain assets of [Life Tech and Biosystems] relating to [Life Tech and Biosystem's] Mass Spec Business and Consumables Business." (License Agreement at 1.)  The recitals concluded, "NOW THEREFORE, in consideration of the mutual promises and covenants set forth herein and in the [Purchase Agreement], the parties, intending to be legally bound, hereto agree." (*Id*.)

In the License Agreement, Life Tech and Biosystems granted AB Sciex licenses to use certain trademarks in certain manners.  Specifically, Life Tech and Biosystems granted AB Sciex (1) "a non-exclusive, limited worldwide, royalty-free and fully paid-up license" to use one set of marks; and (2) "an exclusive (even as to [Life Tech and Biosystems]), perpetual, worldwide,

royalty-free and fully paid-up license" to use another set of marks. (*Id*. §§ 2.1, 2.2.) Both licenses were subject to certain limitations explainted in detail in the License Agreement. (*Id*. §§ 2.1-2.8, 3.5.) The parties also "agree[d] that no additional consideration is owed or due to [Life Tech and Biosystems] for the rights granted to [AB Sciex] hereunder." (*Id*. § 2.9.)

The License Agreement lacks a section explicitly addressing conflict resolution procedures, but does state (1) that the agreement "and any other writing signed by the parties that specifically references this Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements, understandings . . . both written and oral, between the parties with respect to the subject matter hereof," (*id*. § 9.1); and (2) that AB Sciex "acknowledges that monetary relief would not be an adequate remedy for a breach . . . and that [Life Tech and Biosystems] shall be entitled to the enforcement of this Agreement by injunction, . . . without prejudice to any other rights and remedies . . . ." (*id*. § 9.4).

On January 18, 2011, plaintiffs brought this suit asserting claims for, *inter alia*, breach of contract pursuant to the License Agreement, trademark infringement, and related claims against AB Sciex, and breach of contract pursuant to the Purchase Agreement against DH Tech, and sought a preliminary injunction. The Court subsequently denied plaintiffs' motion for a preliminary injunction.

On April 22, 2011, Life Tech and Biosystems filed a demand for arbitration with JAMS, naming both DH Tech and AB Sciex as respondents. (Szekeres Decl. ¶ 12; *see also* Szekeres Decl. Ex. C at 2, 5.) AB Sciex now moves to enjoin the arbitration as against it, arguing primarily that it never signed any agreement to arbitrate with Life Tech or Biosystems.

4

## DISCUSSION

"Arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Ragone v. Atlantic Video at Manhattan Center,* 595 F.3d 115, 126 (2d Cir. 2010) (alterations omitted, citing *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004)).  The Second Circuit "ha[s] stated," however, "that non-signatories may be bound by arbitration agreements entered into by others . . . pursuant to five different theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999) (citing *Thomson-CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir. 1995)); *see also MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F. Supp. 2d 380, 398 n.9 (S.D.N.Y. 2009).

Plaintiffs here contend that AB Sciex must arbitrate under an estoppel theory.[2]  "A nonsignatory may be estopped from avoiding arbitration where it 'knowingly accepted the benefits of an agreement with an arbitration clause.'" *Bank of Am. Nat'l Ass'n v. Sopher*, 10 Civ. 8870, 2011 WL 2419872, at *3 (S.D.N.Y. June 8, 2011) (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001)); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993).  "The benefits must be

---

[2] Plaintiffs' Demand for Arbitration Before JAMS suggests two additional grounds for forcing AB Sciex to arbitrate: (1) that because the Purchase Agreement includes as disputes subject to arbitrability those arising out of or relating to the License Agreement, and because AB Sciex is a DH Tech affiliate, "[DH Tech's] commitment to arbitrate is binding on [AB Sciex]"; and (2) that the Purchase Agreement requires that DH Tech cause its affiliates, including AB Sciex, "to comply with all requirements of the [Purchase Agreement], including the Arbitration Agreement." (Szekeres Decl. Ex. C at 3.)  Plaintiffs do not pursue those theories on this motion, however, and therefore the Court does not consider them.  *See Castlewood (US), Inc. v. Nat'l Indem. Co.*, No. 06 Civ. 6842, 2006 WL 3026039, at *7 n.7 (S.D.N.Y. Oct. 24, 2006) ("In its opposition brief, NICO does not claim that Castlewood is required to arbitrate based on any theories other than assumption and estoppel.  Accordingly, the Court does not address the three remaining theories upon which a non-signatory can be compelled to arbitration.").  In any event, because the Court finds AB Sciex estopped from avoiding arbitration, it need not address any other possible theories for binding AB Sciex to the Purchase Agreement's arbitration clause.  *See Tencara Shipyard*, 170 F.3d at 352 & n.3.  In addition, Plaintiffs concede that the Court, and not the arbitral tribunal, should determine whether AB Sciex is subject to arbitration.  (*See* Pls.' Opp'n at 2 n.5 ("For sake of efficiency, plaintiffs do not object to the Court (rather than the arbitration panel) determining whether [AB Sciex] must arbitrate.").)

5

direct—which is to say, flowing directly from the agreement." *Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09 Civ. 8154, 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010) (quoting *MAG Portfolio*, 268 F.3d at 61); *see also Tencara Shipyard*, 170 F.3d at 353.  In contrast, "the benefit derived from an agreement is indirect," and is therefore insufficient to support estoppel, "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 458 (S.D.N.Y. 2007); *see also MAG Portfolio*, 268 F.3d at 61. Likewise, "the mere fact of a nonsignatory's affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is." *Oppenheimer & Co.*, 2010 WL 743915, at *2.

Four Second Circuit cases illuminate the difference between a benefit flowing directly from a contract and one flowing only from the contractual relations of other parties.  In *Tencara Shipyard*, prospective ship owners contracted with an Italian shipyard to construct a racing yacht. 170 F.3d at 351.  That contract, which did not include an arbitration clause, required that the yacht be "classed."[3]  *Id*.  The shipyard then contracted with ABS, a classification society, to obtain classification.  *Id*.  The classification contract did contain an arbitration clause.  After the yacht later suffered "serious hull damage during a cruise to Venice," *id*., the shipyard and the owners sued ABS in Europe, and ABS brought an action in this district to compel both to arbitrate.  *Id*.  Reversing the district court, the Second Circuit held that the owners—not signed to any agreement containing an arbitration clause—were nonetheless estopped from avoiding arbitration pursuant to the classification contract between the shipyard and ABS.  *Id*. at 353.  The

---

[3] "'Classification' is a term of art in maritime contract law.  It refers to the process by which a ship is inspected to make sure it is seaworthy and complies with various safety regulations. . . . Vessel classifications provide two major benefits for shipowners.  First, insurance is much less expensive for classed ships than for non-classed ships. Second, many governments . . . require a vessel classification before they will allow a craft to sail under their national flag." *Tencara Shipyard*, 170 F.3d at 351.

6

owners had received a direct benefit from that agreement because (1) the yacht was thereby able to raise the French flag; and (2) the yacht was thereby subject to lower insurance rates. *Id*. Explaining that decision later, the Second Circuit stated "[i]n short, the [classification] agreement was made by one of the signatories for the purpose of completing business it had with the nonsigning owners." *MAG Portfolio*, 268 F.3d at 63 (discussing *Tencara Shipyard*).

The circuit also applied estoppel in reversing the district court and compelling arbitration in *Deloitte Noraudit*. There Deloitte U.S. agreed with all of its worldwide affiliates to form Deloitte International, a process completed by contracting in 1988. 9 F.3d at 1061. That 1988 contract vested all rights to the name "Deloitte" in Deloitte U.K., and granted all the Deloitte member firms the right to use the name "Deloitte." *Id*. at 1062. When Deloitte International later sought to merge with Touche-Ross International, however, Deloitte U.K. objected, threatening Deloitte International and the other Deloitte member firms' use of the name "Deloitte." *Id*. at 1061. Deloitte International eventually settled with Deloitte U.K., ending the dispute, giving all Deloitte member firms a limited right to use the name "Deloitte," and requiring arbitration of disputes arising from the settlement. *Id*. at 1061-63. Deloitte Norway later used "Deloitte" contrary to the terms of the settlement, and sought a judgment in this district declaring its use of "Deloitte" proper. *Id*. at 1062. The district court found that the issue arose from the 1988 contract and that Deloitte Norway did not sign the 1990 settlement, and denied Deloitte International and its member firms' motion to compel arbitration. *Id*. Reversing the district court and holding Deloitte Norway estopped from avoiding arbitration, the Second Circuit found that Deloitte Norway had "knowingly accepted the benefits" of the 1990 settlement by using the name "Deloitte" and by failing to object to the settlement's signing by Deloitte International. *Id*. at 1064.

The Second Circuit has, of course, also found parties able to avoid arbitration and the doctrine of estoppel.  In *MAG Portfolio*, MAG, the owner of a fifty-percent stake in three joint ventures known as the Old Merlins, sold its stake to MBAM in return for a limited percentage of future profits of the Old Merlins.  268 F.3d at 60.  That sale was executed through a contract containing an arbitration clause.  *Id*.  Later, the Old Merlins were reformed into new companies known as the New Merlins.  *Id*.  When litigation ensued between MAG, MBAM, and the New Merlins, MAG sought to bind the New Merlins to the purchase contract's arbitration clause through an estoppel theory.  *Id*. at 60-61.  But the Second Circuit rejected MAG's argument that "the direct benefit to the new Merlins [was] the receipt of the percentage of profits that would be due to MAG had the new Merlins not supplanted the old Merlins."  *Id*. at 62.  Instead, the "benefit to [the New Merlins] would not flow, in such a case, from the agreement [between the Old Merlins and MAG] itself, but from [the New Merlins'] ability to evade the intent of the agreement."  *Id*. at 63.  Because the New Merlins were not exploiting the original contract, they were not estopped from avoiding that contract's arbitration provision.  *Id*.

The point was more clearly made in *Thomson-CSF*.  There E&S and Rediffision had signed an exclusive dealing agreement containing an arbitration clause.  64 F.3d at 775.  Later, an E&S competitor, Thomson, purchased Rediffusion.  *Id*.  Thomson intended to forever refrain from purchasing equipment from E&S and thereby, because of the exclusive dealing agreement, effectively shut E&S out of the market.  *Id*. at 775, 778-79.  E&S brought claims in arbitration arising out of Thomson's purchase of Rediffusion, and Thomson sought to enjoin that arbitration.  *Id*. at 776.  The Second Circuit found Thomson not estopped from avoiding arbitration because Thomson had only indirectly benefitted from the exclusive dealing agreement.  *Id*. at 779.  This was so because Thomson's benefit flowed from E&S and

Rediffusion's contractual relationship and not from those companies' contract itself. *Id.* It did not matter that but for the exclusive dealing agreement, Thomson would not have been able to obtain the benefit of eliminating a competitor—in fact that benefit could have been realized only by *purposefully avoiding* the direct benefits contemplated by the exclusivity agreement, namely commercial activity. *Id.*

Though the Second Circuit does not draw the distinctions explicitly, two appear to arise from the cases detailed above. First, benefits are direct—and therefore will lead to estoppel when knowingly exploited—when arising specifically from the unsigned contract containing the arbitration clause; and benefits are indirect—and therefore will not lead to estoppel even if knowingly exploited—when merely incidental to the contract's execution. *Compare Tencara Shipyard*, 170 F.3d at 351-53 (shipyard's contract with classification society for classification lowered owners' insurance rates and allowed owners to fly national colors, and owners did so) *and Deloitte Noraudit*, 9 F.3d at 1061-64 (company's settlement with litigation opponent permitted affiliates to use trade name, and affiliates had knowledge of settlement and actually used trade name), *with Thomson-CSF*, 64 F.3d at 778-79 (competitor able to squeeze out rival because of rival's prior entry into exclusive dealing agreement with company bought by competitor, which agreement competitor never intended to invoke). Second, benefits are direct when specifically contemplated by the relevant parties; and benefits are indirect when the parties to the agreement with the arbitration clause would not have originally contemplated the non-signatory's eventual benefit. *Compare Tencara Shipyard*, 170 F.3d at 351-53 (owners' contract with shipyard explicitly required subsequent contract for classification), *with Thomson-CSF*, 64 F.3d at 778-79 (original party to exclusive dealing agreement purchased by third party so third party could force original counterparty out of business).

The case at bar lies somewhere in the middle.  But the Court concludes that AB Sciex, like the prospective yacht owners in *Tencara Shipyard*, knowingly exploited a direct benefit of a separate agreement containing an arbitration clause, and is therefore estopped from avoiding arbitration under that agreement.

Here, DH Tech signed the Purchase Agreement with Life Tech, containing an arbitration clause, for the sale of Life Tech's mass spectrometry business to DH Tech.  In addition, the agreement required that the parties or their affiliates execute the License Agreement.  (*See* Purchase Agreement ¶ 7.8.)  Subsequently, AB Sciex signed the License Agreement with Life Tech and Biosystems, not containing an arbitration clause, for the license of certain Life Tech and Biosystems trademarks to AB Sciex.  And AB Sciex proceeded to use those trademarks in connection with it and DH Tech's mass spectrometry operations and, allegedly, other businesses.  True that AB Sciex is not a signatory to the Purchase Agreement.  But the Purchase Agreement explicitly contemplates the license of the relevant trademarks to DH Tech or one of its affiliates, and the License Agreement explicitly references the Purchase Agreement in its recitals.  In addition, AB Sciex's benefit was provided for by Purchase Agreement, even if it was not ultimately transferred until the execution of the License Agreement.

This benefit is not analogous to the one exploited in *Thomson-CSF* where the non-signatory was able to squeeze out its rival as an incidental result of its rival's prior execution of an exclusive dealing agreement.  Indeed, in that case the ultimate result was in direct contrast to the original parties' intent.  The situation at bar is, however, analogous to, though perhaps the converse of, *Tencara Shipyard*.  There estoppel applied when (1) two parties' first contract anticipated a second contract, which then contained an arbitration clause; (2) the second contract created a direct benefit to the party signed only to the first; and (3) the second contract was

signed "for the purpose of completing business" under the first contract. *MAG Portfolio*, 268 F.3d at 63 (discussing *Tencara Shipyard*, 170 F.3d at 351-53). Here it is (1) the first contract that contained the arbitration clause and anticipated the second; (2) the first contract that created the direct benefit to its non-signatory; and (3) the License Agreement was in fact *required* to complete the business contemplated by the Purchase Agreement. Yet this conversion in order only strengthens the Court's conclusion that estoppel prevents AB Sciex from avoiding the Purchase Agreement's arbitration clause. Nothing in *Tencara Shipyard* suggests that the yacht owners knew, prior to their examination of the executed classification contract, that that contract would contain an arbitration provision.[4] Yet they were bound by that provision. Here the Purchase Agreement containing the arbitration provision and providing for the ultimate benefit to AB Sciex was signed *prior* to AB Sciex's License Agreement, both of which closed just under five months later.

The *Deloitte Noraudit* case supports the Court's conclusion for similar reasons. Because Deloitte Norway took benefits from Deloitte International's settlement with Deloitte U.K.— namely, using the "Deloitte" name—and because Deloitte Norway knew of yet failed to oppose that settlement in any way, Deloitte Norway was bound to the settlement's arbitration provision. Likewise here, AB Sciex, as an affiliate of DH Tech and because the License Agreement references it, undoubtedly knew of the Purchase Agreement which called for the execution of the License Agreement. *Cf. Best Concrete Mix Corp. v. Lloyd's of London Underwriters*, 413 F. Supp. 2d 182, 187 (E.D.N.Y. 2006) ("The Court recognizes that a number of cases in this circuit applying the estoppel theory involve non-signatories that failed to object to an arbitration clause despite having actual knowledge of the contents of an agreement. Nonetheless, *even if Best had*

---

[4] The shipyard executed the classification contract with the classification society in March 1992. *Tencara Shipyard*, 170 F.3d at 351. The prospective yacht owners only received a copy of that agreement in May 1992. *Id.*

11

*not actually seen the policy* before initiating its declaratory judgment action, it is surely chargeable with knowledge of its contents." (internal citation omitted) (emphasis added)).  AB Sciex subsequently entered into the License Agreement, without opposing any provision in the Purchase Agreement, thereby knowingly exploiting the benefits of the Purchase Agreement.

AB Sciex knowingly accepted and exploited benefits provided for in, and contemplated by, a contract containing an arbitration provision.  It executed the License Agreement only because that agreement was called for by the Purchase Agreement; and it obtained trademarks and used those trademarks in commerce only because the Purchase Agreement required that Life Tech or its affiliates license the marks to DH Tech or its affiliates.  The DH Tech affiliate eventually chosen, AB Sciex, is therefore bound to the arbitration clause in the Purchase Agreement.  *See, e.g.*, *Wu v. Pearson Educ., Inc.*, No. 09 Civ. 6557, 2010 WL 3791676, at *1, *3 (S.D.N.Y. Sept. 29, 2010) (copyright owner who contracted with copyright licensor to have licensor license his photographs was bound by arbitration clause in licensor's agreement with licensee because owner received portion of licensing fees); *In re HBLS, L.P.*, 01 Civ. 2025, 2001 WL 1490696, at *1, *9 (S.D.N.Y. Nov. 21, 2001) ("significant shareholder" in party to a settlement agreement containing an arbitration provision estopped from avoiding arbitration on ground that he himself was not party to settlement agreement because he "knowingly obtained the expected benefits that a person interested in the financial status of the [settling company] would obtain from a settlement").  Indeed, courts in this circuit have applied estoppel in situations far closer to *Thomson-CSF*, and exploitation of mere "contractual relations," than that is presented by this case.  *See, e.g.*, *Ryan, Beck & Co., LLC. v. Fakih*, 268 F. Supp. 2d 210, 214-16, 220 (E.D.N.Y. 2003) (investors in arbitration with investment company pursuant to investment contracts; investment company purchased by buyer through contract that explicitly

disclaimed "liabilities for litigation, arbitration or other claims"; buyer estopped from avoiding arbitration with investors because by purchasing the investment company it knowingly exploited the benefits of the investment contracts, namely the clients and their funds).

The thrust of AB Sciex's argument is that because its rights in the trademarks arise from the License Agreement, and because plaintiffs' claims are grounded in that agreement, AB Sciex therefore cannot be bound to the Purchase Agreement's arbitration provision.  But the doctrine of estoppel is intended to address that precise issue; and the cases that apply it despite the existence of collateral agreements, including *Tencara Shipyard*, *Deloitte Noraudit*, and *Wu*, belie AB Sciex's argument.  Moreover, the cases cited by AB Sciex for support are readily distinguishable.  *See MAG Portfolio*, 268 F.3d at 62-63 (new companies' gain of profits previously pledged to third party though manipulation of corporate forms not a direct benefit of manipulated old companies' earlier contracts with third party containing arbitration provisions); *GEPF, Inc. v. City Lights Int'l, Inc.*, No 09 Civ. 4942, 2010 WL 5222124, at *3 (S.D.N.Y. Dec. 22, 2010) (declining to apply doctrine of incorporation by reference to compel arbitration when later contract signed by party resisting arbitration referred to earlier contract not signed by that party only for one option for calculation of debt owed under later contract); *Castlewood (US)*, 2006 WL 3026039, at *1, *6-7 (claims servicer's contract with insurance company to service a specific type of claims was not a direct benefit to claims servicer arising out of insurance company's contract with reinsurance company, containing an arbitration clause, to provide insurance to insurance company for those claims); *Masefield AG v. Colonial Oil Industries, Inc.*, No 05 Civ. 2231, 2005 WL 911770, at *1, *4 (S.D.N.Y. Apr. 18, 2005) (transfer of proceeds from contract for sale of oil, containing an arbitration clause, by seller to seller's affiliate not a

direct benefit to the affiliate of the sales contract because the seller transferred the proceeds only to satisfy seller's prior-existing debts to affiliate).[5]

By executing the License Agreement, contracting for the trademarks, and using the trademarks in commerce, all with the knowledge of the Purchase Agreement, AB Sciex has knowingly exploited the benefits of the Purchase Agreement. Accordingly, AB Sciex is estopped from avoiding arbitration under the Purchase Agreement's arbitration provision despite not having signed the Purchase Agreement.

## CONCLUSION

For the foregoing reasons, AB Sciex's motion to enjoin arbitration **[45]** is DENIED.

SO ORDERED.

Dated: New York, New York
       August \_\_, 2011

_____
Richard J. Holwell
United States District Judge

---

[5] AB Sciex also makes the argument that the doctrine of estoppel is not available when the benefit exploited is granted in an agreement with no arbitration clause. (*See* Def.'s Reply at 5 ("The existence of an agreement between the parties regarding the very subject matter of the dispute sets this case apart from those cases in which courts have looked to equitable theories to require a non-signatory to arbitrate. Plaintiffs do not cite a single case holding that the doctrine of equitable estoppel can be employed to rewrite an agreement that governs the underlying dispute (the [License Agreement]) by importing an arbitration provision from an agreement that does not govern the underlying dispute and that the party opposing arbitration did not sign (the [Purchase Agreement])." (emphasis in original).) Nor, however, does AB Sciex cite a single case explaining what difference this distinction makes. And indeed the *Tencara Shipyard* case appears quite clearly to demonstrate that it makes none.

14